IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


SHERRY I. HEROD                                                                    PLAINTIFF


          v.                          Civil No. 05-5130


JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                         DEFENDANT


**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Sherry I. Herod, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration denying

her application for disability insurance benefits (DIB) under the provisions of Title II and

supplemental security income benefits (SSI) under Title XVI of the Social Security Act.  The

court has before it the briefs of the parties (Doc. 4 & Doc. 5) and the transcript of the social

security proceedings.

 **Procedural Background:**

Herod protectively filed her applications for DIB and SSI on April 3, 2003.  (Tr. 12, 54-

56, 226-229).  She alleged a disability onset date of March 15, 2003, due to a degenerative disc

at L5-S1, permanent damage to her right shoulder and neck, chronic back and shoulder pain, high

blood pressure, and depression.  (Tr. 13, 72).

Herod's applications were denied initially and on reconsideration.  (Tr. 28-29, 30-31,

230, 236-237).  She requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 41).

A hearing was held on August 18, 2004.  (Tr. 242-272).  Herod appeared and testified.  (Tr. 248-

AO72A
(Rev. 8/82)

266) Herod was represented by counsel. (Tr. 244). Herod's husband, Morris E. Herod, testified. (Tr. 256, 266-267). Dale Thomas, a vocational expert, was also called to testify. (Tr. 267-271).

By written decision dated January 10, 2005, the ALJ found that while the evidence established Herod has slight degenerative disc disease with disc bulge, impairments that were severe, there was no medical evidence of an impairment that met or equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 13). The ALJ the concluded Herod could not return to her past relevant work but had the residual functional capacity (RFC) to perform a significant range of light work with a sit/stand option. (Tr. 17, 19). The ALJ therefore found Herod not disabled within the meaning of the Social Security Act. (Tr. 18).

On January 28, 2005, Herod requested a review on the record. (Tr. 7). The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Herod's request for review. (Tr. 3-6).

**Evidence Presented:**

At the hearing before the ALJ, Herod testified she was forty-six years old. (Tr. 248). She completed the ninth grade and then received her general equivalency diploma (GED). (Tr. 251). She also completed a secretarial training course. (Tr. 251).

She is left handed. (Tr. 248). She lives with her husband. (Tr. 250).

Herod testified that she fell in her driveway on ice. (Tr. 258). Since she fell in January of 2001, she has gained about fifteen pounds. (Tr. 250-251).

AO72A
(Rev. 8/82)

She last worked in April of 2003 in a hospital as a clerk in the records department. (Tr. 251-252). She has also worked as an auditor, a data management specialist, a manager of a convenience store, a cashier, a desk top publisher, and selling firewood. (Tr. 253-255).

Herod testified she drives but not much because of the pain. (Tr. 255). When she does drive, she testified she has to take frequent stops. (Tr. 255).

Although Herod has medical insurance through her husband's work, she doesn't go to the doctor much because she doesn't get any relief and she feels it's a waste of time. (Tr. 256). Additionally, she does not have the money to cover the co-pay for the doctor's visits and any portion of the visit the insurance does not cover. (Tr. 256). With prescriptions, Herod indicated they had a $20 co-pay with every prescription. (Tr. 256). She indicated the prescriptions added up to quite a bit of money that they couldn't afford with her not working and it wasn't giving her much relief. (Tr. 256-257). Herod smokes but testified she is trying to quit. (Tr. 257).

Herod testified she does not do much shopping and doesn't do hardly any housework. (Tr. 257). She spends her days kind of laying around, working a lot of crossword puzzles, and watching movies. (Tr. 257). She stated she moves around a lot because she can't stay in any particular position for long. (Tr. 257).

Herod testified she had been told about a surgical option but the chances of her getting better were not very good. (Tr. 258). Herod testified that Dr. Foster told her she had a pretty good chance that she could be even worse after the surgery than she was now. (Tr. 258). Herod stated Dr. Foster indicated she had a chance of ending up paralyzed. (Tr. 258). Herod indicated she had been told she would have to have the surgery eventually. (Tr. 258).

-3-

AO72A
(Rev. 8/82)

Since she had last been to the back doctor, Herod testified her back has deteriorated. (Tr. 261). She indicated she is in pain more frequently. (Tr. 261). She stated the pain is constant although there are times it is worse. (Tr. 261). Additionally, she testified the pain now goes down her left leg and she has spasms that just about bring her to her knees. (Tr. 261). She stated she also still has pain in her right shoulder and neck that causes frequent headaches. (Tr. 261).

Herod testified she doesn't sleep well at night. (Tr. 261). She can maybe sleep four or five hours at the most. (Tr. 261). She lays down a couple of times a day for forty-five minutes to a couple of hours. (Tr. 261-262).

She has high blood pressure. (Tr. 262). It causes her to be lightheaded and have headaches. (Tr. 262). She also gets extra tired when her blood pressure is high. (Tr. 262). It bothers her almost every day. (Tr. 262). At the time, Herod testified she didn't take any medications for high blood pressure. (Tr. 262).

She took anti-depressants for a time. (Tr. 262). Dr. Weaver's office prescribed them. (Tr. 262). She doesn't take them anymore because of the money situation but believes the medication would probably help. (Tr. 262). She got headaches from the medication and sometimes nausea. (Tr. 263).

Herod testified she no longer plays with her grandchildren, goes bowling, goes camping, or travels. (Tr. 263). Herod indicated she can somewhat take care of her personal needs but can't wash her feet a lot of times and wears mostly slip on shoes. (Tr. 263). She half way keeps the house picked up. (Tr. 263). She gets behind on dishes because she can't stand at the sink long enough to do a meal's worth of dishes. (Tr. 263).

-4-

AO72A
(Rev. 8/82)

Herod testified she cannot sit comfortably. (Tr. 264). She stated she could sit for twenty, maybe thirty minutes, depending on the type of chair. (Tr. 264).

She testified the only medication she was taking was over-the-counter Aleve. (Tr. 264). She takes two tablets four to five times a day. (Tr. 264).

She had one injection in her back and that helped for about a month. (Tr. 265). She is seeing Dr. Weaver now but he isn't doing anything for her. (Tr. 265).

She has asthma and did use an Albuterol inhaler. (Tr. 265). However, Herod testified she had been out of it for sometime and the pollen in the air had been causing her problems. (Tr. 265). Herod testified her smoking aggravates her asthma and that is one reason she is trying to quit. (Tr. 265).

Herod testified she had went on one trip to see her son-in-law graduate from Air Force basic camp. (Tr. 266). The graduation was in San Antonio, Texas, and it took her sixteen and a half hours to drive down there. (Tr. 266). Herod took turns driving. (Tr. 266).

Morris Herod, claimant's husband, testified things changed drastically after his wife got hurt. (Tr. 266). He indicated they no longer went camping or fishing and don't even go to movies because she can't sit and watch a movie. (Tr. 266-267).

He works ten and twelve hour days but tries to help with the cooking and cleaning. (Tr. 267). Morris testified his wife just cannot keep up. (Tr. 267).

Morris testified that when Herod sleeps she tosses and turns so much that sometimes he has to get up and go to where he can sleep. (Tr. 267). He indicated back pain is Herod's biggest problem. (Tr. 267).

-5-

AO72A
(Rev. 8/82)

Dale Thomas, a vocational expert, was asked to assume they were talking about an individual with the same chronological, vocational, and educational background as Herod. (Tr. 268). However, the hypothetical individual "only has the residual functional capacity to perform light work as that term is defined. Clearly, however, this hypothetical person needs a job whereby this person must be able to sit and stand at will." (Tr. 268). Thomas was asked if this person could return to any of Herod's past relevant work. (Tr. 268). He responded no. (Tr. 268).

Thomas, however, stated there would be other jobs this individual could perform. (Tr. 269). These jobs included inventory clerks, production workers, and cashiers. (Tr. 269). If the person needed a sedentary weight restriction with the same sit/stand option, Thomas was asked if there were any jobs the person could perform. (Tr. 269). He indicated this person could do cashier jobs and work as an office supervisor. (Tr. 270).

Herod's counsel asked Thomas to add the limitation that the person had to lie down a couple of times a day due to fatigue for an hour or more. (Tr. 270-271). Thomas testified the person could not return to the jobs he identified. (Tr. 271).

The medical and vocational evidence in the transcript reveals the following. On August 9, 2000, Herod was seen by Dr. Lueders. (Tr. 212). She was complaining of ear pressure, productive sinus drainage, sore throat, and headache. (Tr. 212). She was diagnosed with sinusitis, a history of asthma, stable, and tobacco abuse. (Tr. 212). Note was made of the fact that Herod knew what a poor decision it was for her to smoke when she had a history of asthma. (Tr. 212).

-6-

AO72A
(Rev. 8/82)

On August 28, 2000, Herod was seen by Dr. Lueders. (Tr. 210). She was diagnosed with right ear pressure secondary to effusion and laryngitis. (Tr. 210).

On January 5, 2001, Herod was seen by Dr. Lueders. (Tr. 208). She reported having fallen on the ice the day before. (Tr. 208). She had pain into the right anterolateral thigh and down the right posterior buttocks. (Tr. 208). Her pain in the back area was worse when she sat. (Tr. 208).

Her straight leg test was negative bilaterally. (Tr. 208). Tenderness in the right SI joint area was noted. (Tr. 208). She had limited range of motion of the back secondary to pain. (Tr. 208). Herod was diagnosed with low back pain and prescribed Relafen and Percocet. (Tr. 208). She was told to use ice for three days and then heat. (Tr. 208). She was excused from work on January 8th and 9th. (Tr. 207).

On January 10, 2001, Herod was seen by Dr. Lueders. (Tr. 201). Herod reported still being in severe pain. (Tr. 201). The pain was in the right gluteal area and radiated to the right thigh area. (Tr. 201). Herod reported the Percocet helped, the Relafen did not, and the Flexeril helped her rest at night. (Tr. 201). Herod had used the ice as directed by Dr. Lueders and was going to start heat therapy. (Tr. 201). Dr. Lueders also referred her for physical therapy. (Tr. 201). Dr. Lueders switched her to Celebrex, started Ultram, continued her on Flexeril, and advised her to use her remaining Percocet sparingly. (Tr. 201). He indicated Herod would need to be off work for at least the next two weeks. (Tr. 204).

X-rays of Herod's lumbar spine taken on January 10, 2001, were negative for acute fracture or malalignment but there was some straightening of the lordosis which could be due to muscular spasm. (Tr. 205). There was also a mild degenerative change at the L5-S1 level

-7-

AO72A
(Rev. 8/82)

predominately with less advanced degenerative disc disease at the thoracolumbar junction. (Tr. 205).

From January 11, 2001, through January 15, 2001, Herod was seen three times for physical therapy at the Physical Medicine Department of St. Mary's Hospital/Mercy Health Center. (Tr. 192). On her first visit on January 11th, Herod reported that she was only able to sit or stand in one position for approximately 5 minutes before she had to move. (Tr. 202). She also reported waking at night with movement and pain with walking, laughing, coughing, and sneezing. (Tr. 202). She indicated her pain was in the right lower aspect of her low back, radiating into the buttock and lateral hip. (Tr. 202). On a scale of zero to ten, she rated her pain as an eight. (Tr. 202).

It was noted that Herod could not sit evenly on her buttock and sat with her weight shifted onto her left hip. (Tr. 202). Note was also made of the fact that she ambulated with very short steps and with a very antalgic gait. (Tr. 202). A complete evaluation could not be performed as her pain level was so severe that Herod could not tolerate much movement. (Tr. 202). Moist heat and electrical stimulation were applied to her low back while she was seated in a recliner. (Tr. 202).

On her last visit on January 15th, Herod continued to report right sided low back pain. (Tr. 192). She rated the pain as an 8 on a scale of 10. (Tr. 192). She reported having over done it on January 12th with travel in preparation for her daughter's wedding. (Tr. 192). She was reported to have a poor tolerance for movement. (Tr. 192). Following three visits, Herod failed to return to therapy. (Tr. 192).

AO72A
(Rev. 8/82)

On January 18, 2001, Dr. Lueders wrote that Herod's examination findings seemed fairly minimal as did x-ray findings. (Tr. 197). He noted she had shown only minimal improvement since he had first seen her on January 5, 2001. (Tr. 197 & 199). He indicated he had scheduled her for a magnetic resonance imaging (MRI) and was referring her to a back specialist, Dr. Raben. (Tr. 197 & 199). He stated he did not see any long-term disability issue and felt she would respond to physical therapy. (Tr. 197). Dr. Lueders also indicated Herod should be off work for two more weeks and possibly more which would be determined once she had the MRI and saw the specialist. (Tr. 198).

On January 22, 2001, Herod underwent a MRI of her lumbar spine. (Tr. 196). It showed a moderate posterior disc protrusion at L5-S1 and a mild posterior bulging in the L4-5 intervertebral disc. (Tr. 196).

On January 29, 2001, Dr. Cyril A. Rabin diagnosed Herod with piriformis syndrome and probable ischial bursitis. (Tr. 195). He recommended Herod undergo hydrotherapy, water aerobics and swimming modalities. (Tr. 195). He continued her on a nonsteroidal anti-inflammatory, Ultram for pain during the day, and Valium and Lortab for pain and spasm in the evening. (Tr. 195).

On April 20, 2001, Dr. R. Doug Foster, of the N.W. Arkansas Spine & Orthopaedics Associates, LLC., saw Herod for a re-evaluation. (Tr. 190). Herod was complaining of severe pain in her right buttock as well as the right groin. (Tr. 190). She indicated pain was made worse by walking and activities. (Tr. 190).

Upon physical examination of her lower extremities her knee jerks and ankle jerks were +1. (Tr. 190). Her range of motion of the right hip was painful on internal and external rotation.

-9-

(Tr. 190). Extension caused pain in the groin and buttock. (Tr. 190). Lumbar spine range of motion was decreased but not nearly as painful. (Tr. 190). The neurologic examination was normal. (Tr. 190). She had no anterior superior iliac spine tenderness or pain. (Tr. 190). The left hip examination was negative. (Tr. 190).

Dr. Foster reviewed her MRI which showed significant degenerative disc disease at L5/S1 and a bone scan failed to show any other activity. (Tr. 190). X-rays of her right hip were normal. (Tr. 190). Dr. Foster recommended a MRI of her right hip to rule out avascular necrosis of the hip (AVN). (Tr. 190).

On May 4, 2001, Herod was seen by Dr. Foster. (Tr. 189). Her MRI showed a lesion in her right ilium. (Tr. 189). It was determined a biopsy should be done. (Tr. 189).

On May 21, 2001, Herod returned to Dr. Foster to obtain her biopsy results. (Tr. 188). The bone biopsy was negative which resolved the right sided ilium issue. (Tr. 188). It was decided to proceed with an L5/S1 disc space injection. (Tr. 188).

On June 4, 2001, Herod was seen by Dr. Foster. (Tr. 187). She indicated the L5/S1 disc space injection by Dr. Raben had given her 40% relief of her pain. (Tr. 187). Dr. Foster noted they would arrange a program for her erector spinae and repeat her therapy. (Tr. 187). If she failed to improve, he was going to present her with other options including a 360 degree fusion. (Tr. 187). On June 28, 2001, Dr. Foster noted Herod was still having pain in her back but wanted to delay surgery. (Tr. 186). Dr. Foster explained that it was her choice whether to have the fusion surgery. (Tr. 186). Herod was kept off work and scheduled to return in a month. (Tr. 186).

-10-

AO72A
(Rev. 8/82)

On October 24, 2001, Herod was seen at the Siloam Springs Memorial Hospital emergency room after being involved in an automobile accident. (Tr. 182). She complained of pain to the right side of her neck, the right shoulder, and right scapular. (Tr. 182). Swelling and bruising was noted to the left wrist. (Tr. 182). She was diagnosed with muscular pain to her cervical spine and right shoulder and given a splint to wear on her left wrist for forty-eight hours. (Tr. 184). She was to follow-up with her local doctor in twenty-four to forty-eight hours if she was not improving. (Tr. 185).

Between November 5, 2001, and October of 2002, Herod underwent treatments at the Ziegler Chiropractic Clinic. (Tr. 150-181). On November 6, 2001, Herod was diagnosed with a hyperflexion/hyperextension injury, muscle spasms, cervical radiculitis, and segmented dysfunction. (Tr. 174). In January of 2002, although Herod still had a decreased range of motion in her right shoulder it was noted she had a 10 degree improvement from the November 5, 2001, visit. (Tr. 173). In May of 2002, it was noted she had a decreased range of motion in her right shoulder. (Tr. 159 & 162). It was noted that she had shown overall improvement with residual soreness and pain with movement in her right shoulder and arm. (Tr. 160). The intensity of her headaches had also decreased. (Tr. 160).

Herod was seen at the Community Physician's Group by Dr. R. Weaver, or an advanced practice nurse in his office, on the following occasions:

3/4/2002–Medication is breaking up congestion. Admits to being under stress for almost a year. Discussed regular use of blood pressure medication and need to decrease sodium in diet. (Tr. 133);

10/22/2002–Complaining of fever, chest congestion, cough, headache, and earache. Feels like the inhaler is choking her. Advised to continue medication and the inhaler and that she may use vaporizer and vicks to help open up airways.

-11-

Note was made that Herod smokes. Asthmatic bronchitis. Extension of medical release given. (Tr. 126 & 132);

3/25/2003–Back pain. Wants refill on 800 mg. Ibuprofen and Hydrocodone. Injured her back when she slipped on the ice and landed on her bottom. Dr. Foster recommended surgery. He did an injection. Herod indicated she did not want surgery and would quit her present job rather than undergo surgery. Note made that Herod stood for the entire visit. She was guarding her right side. Right side painful to deep palpation over the right lateral aspect of L4-5 into the rim of the iliac crest. Pain radiating down her right posterior thigh. Forward flexion to 45 degrees only. No right lateral flexion. Fair left lateral flexion. Poor hyper-extension. Positive straight leg raising on the left greater than the right. Referral to orthopedist discussed but Herod declined at the present time. Diagnosed with low back strain, degenerative disc disease, and hypertension. (Tr. 131);

4/1/2003–Back still hurts. Went back to work on March 27th. Was put on blood pressure medication. Reported the Bextra allowed her to sleep better at night. Doesn't feel she will be able to continue at her present job. Feels Celebrex worked just as well. Has some of those at home. Blood pressure still high although a twenty point decrease in systolic pressure seen. Note made that Herod stood during the visit because sitting still hurts her back. Prescribed Toprol XL and Celebrex. Told to continue the Enalapril. Told not to take the Bextra and Celebrex both. Herod advised not to delay treatment of the injury to her back for too long. Herod indicated she would schedule an appointment with Dr. Foster. (Tr. 130);

4/16/2003–Minimal result from Toprol. Tiredness not resolving. Increase Enalapril. (Tr. 126);

6/11/2003–Herod in for a prescription for her inhaler. Reports having no money for an office visit. Enalapril increased. (Tr. 126);

6/30/2003–Norvasc added. Herod instructed to continue Enalapril. (Tr. 126);

7/15/2003–Blood pressure high 150/92. (Tr. 125);

7/18/2003–Herod called. Blood pressure still high. To continue Avalide and Enalapril. (Tr. 125);

7/22/2003–Blood pressure still high. Out of all medication. Complains of chronic back pain. Wants more Vicodin. (Tr. 125 & 129);

-12-

AO72A
(Rev. 8/82)

7/29/2003–Feeling okay on blood pressure medications. Does have some pressure, tightness, and chest pain with exertion. Is concerned about heart disease. EKG done. Start Norvasc. Consult Dr. Weaver about cardiolite test. (Tr. 128);

7/30/2003–Herod advised would like a cardiolite stress test. Herod asked for an estimate of the cost of the test. (Tr. 125);

8/4/2003–Cardiolite stress test and exercise treadmill test are negative.

8/14/2003–Telephone call to Herod. Advised that the results of the treadmill test and cardiolite stress test were all within normal limits. Blood pressure still up. She needs to lose weight and quit smoking. (Tr. 125);

8/15/2003–Blood pressure high (166/96). Herod tearful and under much stress and anxiety. Continue Avalide and add Tiazac. (Tr. 125);

8/22/2003--Telephone call from Herod. Blood pressure still high (160/90). Still stressed and depressed. (Tr. 125);

8/22/2003–Picked up medication samples. Office visit scheduled for the following week. (Tr. 124);

8/28/03–Reports bad headache since the dosage of Tiazac has been increased. Blood pressure still high. Given prescription for Lexapro. Decrease Tiazac. Continue Avalide and add Altace. (Tr. 127);

9/3/2003–Blood pressure check. Blood pressure high. Prescription written for Altace and Herod instructed to take medication at night. (Tr. 124);

9/15/2003–Herod reports blood pressure has been higher and she hasn't been feeling well. Herod indicated she had financial concerns with coming for office visits. Because of financial concerns, Herod reported being out of Altace for several days. Samples given. Herod complained of waking at 3:00 a.m. with right neck and shoulder pain. No signs of acute distress were noted. (Tr. 124);

On April 23, 2003, Herod completed a supplemental interview outline. (Tr. 101-105).

She indicated she could bathe, shave, and take care of her own hair care needs. (Tr. 101). She

AO72A
(Rev. 8/82)

stated she could sometimes dress herself but other times needed assistance with her shoes from her husband. (Tr. 101).

She stated she could do laundry and change sheets. (Tr. 101). With respect to the laundry, Herod indicated she does it with assistance and has to take frequent breaks. (Tr. 101). She could sometimes do the dishes and vacuum/sweep. (Tr. 101). She could not take out the trash, wash the car, or mow the lawn. (Tr. 101).

She stated she could shop for groceries with assistance, shop for clothing, do the banking, and go to the post office. (Tr. 101). Herod indicated she prepared meals two times a week including sandwiches, frozen dinners, meats and vegetables. (Tr. 102). Since her disability began, Herod indicated it took her longer to prepare meals. (Tr. 102).

Herod indicated she could pay bills, use a checkbook, and count change. (Tr. 102). She can drive, including unfamiliar routes, although she has to make frequent stops. (Tr. 102). She cannot walk for exercise or errands. (Tr. 102).

She does not use any assistive devices. (Tr. 102). She stated she spent her time occasionally watching television, listening to the radio, and occasionally visiting friends and relatives. (Tr. 102). For recreation, Herod indicated she goes camping when she is able to. (Tr. 102).

She indicated her disability had made her quit her job or she had been fired twice. (Tr. 102). She stated she couldn't stand or sit longer than thirty to sixty minutes without pain. (Tr. 102).

She indicated she has suffered from unusual fatigue since January of 2001 and has to rest two or more times a day for about an hour at a time. (Tr. 103). She stated she has severe pain

-14-

in her lower back that goes down her left leg, headaches, and pain in her right shoulder and neck. (Tr. 103). She stated her pain never stops. (Tr. 103). Sitting, standing, lifting, bending, or reaching with her right arm all cause the pain. (Tr. 103).

Herod indicated she could stand/walk for thirty to forty-five minutes and sit for thirty minutes before the pain occurred. (Tr. 103). Sitting, standing, and bending make the pain worse. (Tr. 103). Laying on her right side with a pillow between her knees helps with the pain. (Tr. 103). Since her disability began on an average day, Herod indicated she paid bills, did the dishes, fixed meals, cleaned the house (when she was able to), and laid down two to three times a day. (Tr. 104).

On July 1, 2003, Dr. Ronald Crow, a medical consultant, completed a residual physical functional capacity assessment on Herod. (Tr. 135-142). With respect to exertional limitations, it stated Herod could occasionally lift or carry twenty pounds; could frequently lift or carry ten pounds; could stand or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and her ability to push and pull was unlimited other than as show for lift and/or carry. (Tr. 136). No postural, manipulative, visual, communicative, or environmental limitations were established. (Tr. 137-139).

It was noted that the symptoms were attributable to a medically determinable impairment. (Tr. 140). At that time, there was not a treating or examining source statement regarding Herod's physical capacities in the file. (Tr. 141).

On October 30, 2003, an x-ray of her lumbar spine revealed Herod had mild scoliosis with convexity to her left. (Tr. 134). She also had decreased joint space between L5-S1 and L1-

-15-

2 and increased subchondral sclerosis. (Tr. 134). No osteophytes were noted or osteopenia present. (Tr. 134). No masses or fractures were noted. (Tr. 134).

On May 20, 2004, Herod under went a mental status and adaptive functioning evaluation performed by Dr. Richard Back, a clinical neuropsychologist. (Tr. 145-148). Note was made that Herod sat awkwardly on her right hip in the waiting room, arose with difficulty, walked slowly and with obvious pain. (Tr. 145). She stood after fifteen minutes and rocked back and forth from one foot to another while rubbing the small of her back. (Tr. 145). She moved stiffly and slowly. (Tr. 147).

She reported having been in a car wreck in 2001. (Tr. 145). Since that time, Herod indicated she had severe headaches. (Tr. 145). Herod also indicated she fell on ice in January of 2001 and that is when it was discovered she had a deteriorating disc in her lower back. (tr. 145).

Herod stated she could not afford her prescription medications and as a result only took Aleve. (Tr. 145). She smokes a pack and a half of cigarettes a day. (Tr. 146).

She reported being depressed a lot and tired all the time. (Tr. 146). She stated she can cry at the drop of a pin. (Tr. 146).

She reported being able to feed and dress herself. (Tr. 147). She shops at Wal-Mart every two weeks by herself. (Tr. 147). Her husband unloads the groceries when she arrives home. (Tr. 147). She does very few chores because it hurts to stand. (Tr. 147). She cannot operate the vacuum cleaner or scrub the shower. (Tr. 147). She does the laundry but it is hard on her. (Tr. 147). Her husband loads it in the truck and a friend unloads it. (Tr. 147). She does the washing and folding. (Tr. 147).

-16-

AO72A
(Rev. 8/82)

Dr. Back diagnosed Herod with: pain disorder associated with both psychological factors and a general medical condition; major depression, single episode, severe; and nicotine dependence. (Tr. 148). He noted Herod's level of adaptive functioning was severely impaired. (Tr. 148).

On November 4, 2004, Dr. Foster wrote that he had seen Herod on November 3, 2004. (Tr. 220). He stated her diagnosis was L5/S1 degenerative disc disease with foraminal stenosis on both sides. (Tr. 220). He stated Herod was now having L5 radicular complaints. (Tr. 220). In his opinion, Dr. Foster stated: "untreated–Ms. Herod is going to have significant problems that will prevent her from engaging in any capacity or form and will be a chronic problem." (Tr. 220). Dr. Foster indicated his advice at the present time was that Herod undergo surgery to decompress this lesion which could improve her symptomology. (Tr. 220).

An MRI of Herod's lumbar spine dated November 8, 2004, showed mild retrolisthesis of L5 on S1, with moderately severe neuroforaminal narrowing on the left and possibly some impingement upon the exiting L5 nerve root. (Tr. 221). Moderate disc space narrowing and disc deterioration were seen. (Tr. 221). An MRI of the cervical spine was within normal limits. (Tr. 222).

**Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d

-17-

AO72A
(Rev. 8/82)

964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national

-18-

AO72A
(Rev. 8/82)

economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only

if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138,

1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**:

Herod argues the ALJ failed to give proper weight to the evidence and testimony

regarding her depression and pain. She maintains the ALJ improperly discounted the opinions

of Dr. Back and Dr. Foster.

We believe substantial evidence does not support the evaluation of Herod's mental

impairment. As the Eighth Circuit has noted, "[t]he evaluation of a mental impairment is often

more complicated than the evaluation of a claimed physical impairment." *Vester v. Barnhart*,

416 F.3d 886, 892-893 (8th Cir. 2005). The ALJ found Herod's depression to be non-severe.

(Tr. 21). However, in doing so, he stated that he gave little weight to the findings of Dr. Back.

(Tr. 15-16). In deciding to give Dr. Back's opinion little weight, the ALJ noted the evaluation

was done at the request of plaintiff's counsel and it "appeared" Dr. Back had not "administered

any of the usual tests to aid in his diagnoses." (Tr. 15). As Dr. Back's assessment was "clearly

based on the claimant's subjective complaint's," the ALJ found it not fully credible.

The ALJ also indicated he relied on an analysis of the State Agency reviewing

psychologists. (Tr. 17). However, the transcript contains no such records.

On remand, the ALJ should by interrogatory, or other appropriate means, determine

whether Dr. Back administered any tests to Herod or whether his evaluation was based wholly

on his observations of her. Additionally, if a State Agency psychologist did an assessment of

-19-

Herod, the assessment should be obtained and made part of the record. If no State Agency psychologist did an assessment, obviously, the ALJ cannot rely on it.

On remand, additional information should also be sought from Dr. Foster. In Dr. Foster's November 4, 2004, letter, he states that he has "completed the request as to work-related activity in detail." (Tr. 220). Other than the single two paragraph letter from Dr. Foster dated November 4th, there are no further records from Dr. Foster around this date and nothing that contains any detailed information about Herod's ability to perform work-related activities. If Dr. Foster completed some type of assessment regarding Herod's ability to perform work-related activities, it should be obtained. If he did not, the ALJ should consider obtaining such an assessment from Dr. Foster or other orthopedic doctor.

**Conclusion**:

For the reasons stated, I recommend that the decision of the Commissioner be reversed. **The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 15th day of August 2006.


/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)